UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LAURIE OSHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-09-73-B-W |
| | ) | |
| | ) | |
| UNIVERSITY OF MAINE SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT UNIVERSITY OF MAINE SYSTEM'S
MOTION FOR SUMMARY JUDGMENT**

On February 2, 2007, the University of Maine System (System) denied promotion to tenure to Laurie Osher, Ph.D., in the Department of Plant, Soils, and Environmental Sciences (Department) at the University of Maine (University).  On January 29, 2009, Dr. Osher, who is disabled and lesbian, sued the System, claiming retaliation under the Maine Whistleblower Protection Act (MWPA), the Maine Human Rights Act (MHRA), Title VII of the Civil Rights Act of 1964 (Title VII), and 42 U.S.C. § 1983 (§ 1983).  Dr. Osher alleges that the System denied her tenure because she complained about disability and sexual orientation discrimination, and because she spoke out on issues of public concern; the System maintains it denied Dr. Osher tenure because she failed to meet the Department's requirements.[1]  This Court denies the

---

[1] Dr. Osher is Jewish, and she suggested in her memorandum that she "believed Dr. Erich was anti-semitic based on several comments she had made."  *Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* at 4 n.3 (Docket # 41) (*Pl.'s Mem.*).  At oral argument, Dr. Osher expressly waived any claim of retaliation based on racial or religious discrimination.  The Court views any charge of racial or religious discrimination with extreme seriousness, and to make a public charge of anti-Semitism against a faculty member and then to withdraw it leaves this grave accusation without an effective response from Dr. Erich.

Dr. Osher's charge was based on two allegations: that Dr. Erich, knowing Dr. Osher is Jewish, expressed surprise when she met her at a church service and that Dr. Erich told Dr. Osher that she needed to drop her role as advisor to Hillel, the Jewish student organization, if she wanted to get tenure.  *Id.*; *Pl.'s Statement of Additional Facts* ¶ 194 (Docket # 42) (*Pl.'s SMF*).  The System did not deny the first comment and qualified the second, noting

System's motion for summary judgment because a genuine issue of fact exists as to whether its proffered reason for denying Dr. Osher tenure is a pretext for unlawful retaliation.

## I.   STATEMENT OF FACTS

In accordance with the "conventional summary judgment praxis," the Court recounts the facts in a light most favorable to Dr. Osher's theory of the case consistent with record support.[2] *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 17 (1st Cir. 2002). Dr. Osher received a Masters Degree in soil science with a minor in geology, and earned her Ph.D. in environmental science policy and management at the University of California at Berkeley in 1997. *Pl.'s Statement of Additional Facts* ¶ 169 (Docket # 42) (*Pl.'s SMF*). After working as a research associate at the Environmental Protection Agency Dr. Osher was hired by the University in February 1999 as an Assistant Professor of Soil and Water Quality.[3] *Pl.'s SMF* ¶ 170. The position was a probationary tenure track eligible position within the Department of Applied Ecology and Environmental Sciences.[4] *Def.'s Statement of Undisputed Material Facts* ¶¶ 1, 19 (Docket # 25) (*Def.'s SMF*); *Pl.'s Response to Def.'s Statement of Material Fact* ¶ 19 (Docket # 42) (*Pl.'s Resp. to Def.'s SMF*). Her responsibilities were split between research (60%) and teaching

---

that Dr. Erich told Dr. Osher that being advisor to Hillel was taking too much of her time. *Consolidated Statement of Undisputed Material Fact* ¶ 194 (Docket # 48) (*Con. SMF*). To be clear, the Court does not consider Dr. Erich's comments sufficient grounds for the most serious charge of anti-Semitism.

Further, after oral argument, Dr. Osher expressly waived any claim that her causes of action include retaliation for any complaints other than disability and sexual orientation. Thus, for example, Dr. Osher's complaints of gender discrimination to the EOO at the University are not part of her claim against the System. *Stipulation* (Docket # 60) (Stip.) (stipulating that "Plaintiff has withdrawn and no longer asserts any employment practices claims of retaliation or adverse action resulting from her alleged complaints of religious discrimination or gender discrimination") (*Stip.*). Although the parties referred to gender and religious complaints in their statements of material fact and their memoranda, in accordance with the later-filed stipulation, the Court eliminated references to those complaints.

[2] The parties have raised multitudinous objections to the dueling statements of material fact. The Court separately ruled on those requests. In general, the Court has relied on undisputed facts or on Dr. Osher's version when a conflict exists.

[3] The University in Orono is one of seven within the System.

[4] The Department, part of the College of Natural Sciences, Forestry and Agriculture was renamed the Department of Plant, Soils, and Environmental Sciences (PSE). *Def.'s SMF* ¶¶ 1, 2; *Pl.'s Resp. to Def.'s SMF* ¶¶ 1, 2.

(40%).  *Def.'s SMF* ¶ 4; *Pl.'s Resp. to Def.'s SMF* ¶ 4.  She was required to teach Soil and Water

Quality, PSE 344, on a yearly basis.  *Def.'s SMF* ¶ 5; *Pl.'s Resp. to Def.'s SMF* ¶ 5.

Pursuant to the collective bargaining agreement, the probationary period for Dr. Osher's

position was six years plus up to two years of extensions.  *Def.'s SMF* ¶ 19; *Pl.'s Resp. to Def.'s*

*SMF* ¶ 19.  Dr. Osher's initial appointment was from August 1, 1999 to August 1, 2000, and

from August 2000 until August 2006, Dr. Osher was reappointed annually to the position of

Assistant Professor.  *Def.'s SMF* ¶¶ 24, 107; *Pl.'s Resp. to Def.'s SMF* ¶¶ 24, 107.  On December

17, 2001, Dr. Osher submitted a request to the Peer Committee of the Department for a one-year

extension of her tenure clock, and her request was granted.  *Def.'s SMF* ¶¶ 66, 68, 69; *Pl.'s Resp.*

*to Def.'s SMF* ¶¶ 66, 68, 69.  On September 12, 2005, Dr. Osher requested and was granted a

second extension of her probationary period. *Def.'s SMF* ¶¶ 100, 101; *Pl.'s Resp. to DSMF* ¶¶

100, 101.

In October 2006, Dr. Osher submitted her tenure application.  *Def.'s SMF* ¶ 108; *Pl.'s*

*Resp. to DSMF* ¶ 108.  On November 8, 2006, the Peer Review Committee (PRC), comprised of

tenured members of the Department, recommended against granting Dr. Osher promotion to

tenure by a vote of five to one.[5] *Def.'s SMF* ¶ 121; *Pl.'s Resp. to SMF* ¶ 121.  By letter dated

February 2, 2007, Robert Kennedy, the President of the University, informed Dr. Osher that he

concurred with the recommendation of the Provost that she not be promoted to Associate

Professor with tenure.  *Def.'s SMF* ¶ 143; *Pl.'s Resp. to Def.'s SMF* ¶ 143.  Dr. Osher was

informed by the President of the University that she had not been promoted to Associate

Professor with tenure.  *Id.* In accordance with University procedure, she was given a terminal

---

[5] The Department Chair is a nonvoting member of the PRC and provides the PRC with informational resources it
deems necessary.  *Def.'s SMF* ¶ 8; *Pl.'s Resp. to Def.'s SMF* ¶ 8.

contract for the 2007-2008 academic year, ending August 31, 2008.  *Def.'s SMF* ¶ 144; *Pl.'s Resp. to Def.'s SMF* ¶ 144.

In March 2007, Dr. Osher filed two collective bargaining grievances relative to the denial of tenure and the terminal contract.  *Def.'s SMF* ¶ 145; *Pl.'s Resp. to Def.'s SMF* ¶ 145.  The first grievance itemized alleged violations of the collective bargaining agreement by the PRC and PRC Chair, violations of the research evaluation provisions, and improper composition of the Provost's Promotion and Tenure Committee. *Pl.'s Resp. to Def.'s SMF* ¶ 145.  The second grievance brought discrimination claims against the University and objected to the University's failure to attempt informal settlement of Dr. Osher's hostile workplace environment claims.  *Id.* After receiving "right to sue" letters from the Maine Human Rights Commission (MHRC) and the United States Department of Justice, Dr. Osher initiated a Complaint against the System in the state of Maine Superior Court on January 27, 2009.  The System filed its petition for removal and notice of removal on February 25, 2009.

Dr. Osher's Complaint alleges four counts of retaliation in violation of the Maine Whistleblower Protection Act, the Maine Human Rights Act, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1983.  More specifically, Dr. Osher alleges that she was denied tenure in "retaliation for her complaints of discrimination against her on the basis of her disability and her sexual orientation, and her exercise of her First Amendment Rights."  *Pl.'s Mem. in Opp'n to Def.'s Mot. for Summary J.* at 6 (Docket # 41) (*Pl.'s Mem.*).

On October 5, 2009, the System moved for summary judgment.  *Def.'s Motion for Summary J.* (Docket # 24) (*Def.'s Mot.*).  Dr. Osher responded on November 11, 2009.  *Pl.'s Mem.*  The Court held oral Argument on the System's motion on March 25, 2010.

A.      **The Review Process for Reappointment and Tenure**

The review process for Dr. Osher's tenure application was governed by the Peer Committee Guidelines for Faculty Evaluations, Promotion, and Tenure of the Department of Plant, Soil & Environmental Sciences (Guidelines) and the collective bargaining agreement between the System and the Associate Faculties of the University of Maine.  *Def.'s SMF ¶ 6; Pl.'s Resp. to Def.'s SMF ¶ 6.*  The Guidelines establish a PRC responsible for reviewing the progress of each faculty member and recommending, if appropriate, reappointment, promotion and tenure.  *Def.'s SMF ¶¶ 7, 9; Pl.'s Resp. to Def.'s SMF ¶¶ 7, 9.*  This process includes annual evaluations of each faculty member in three areas: instruction, research, and public service.  *Pl.'s SMF ¶ 225.*

Upon completing its evaluation, the PRC makes a recommendation to the Department Chair for reappointment or non-reappointment, or promotion and tenure of the faculty member.  *Def.'s SMF ¶ 12; Pl.'s Resp. to SMF ¶ 12.*  The Department Chair performs an evaluation of the faculty member and makes a recommendation to the Dean of the applicable College.  *Def.'s SMF ¶ 14; Pl.'s Resp. to Def.'s SMF ¶ 14.*  The Dean then performs an evaluation and makes a recommendation to the University Provost, who in turn performs an evaluation and makes a recommendation to the University President.  *Def.'s SMF ¶¶ 15-17.*  Finally, the President then evaluates the faculty member and makes the final decision on reappointment or tenure.  *Def.'s SMF ¶ 17; Pl.'s Resp. to Def.'s SMF ¶ 17.*

Although the recommendation of the PRC is not binding on the Department Chair and the College Dean, it "should be a major factor in their decision to recommend or not recommend reappointment."  *Pl.'s Resp. to Def.'s SMF ¶ 14.*  The Guidelines provide that "[i]n order to be reappointed, a probationary faculty member should have demonstrated that progress toward

5

satisfying the standards for tenure has been made." *Pl.'s SMF* ¶ 173.  Department Guidelines are not binding on administrative reviews that occur after the review of the Chair and Dean.  Def.'s SMF ¶¶ 16, 17.

### B.    Dr. Osher's Departmental Problems

During her employment, Dr. Osher's direct supervisor was the Department Chair.  *Def.'s SMF* ¶ 25; *Pl.'s Resp. to Def.'s SMF* ¶ 25.   Between July 1999 and July 2002 the Department Chair was Dr. Ivan Fernandez.  *Def.'s SMF* ¶¶ 20, 70; *Pl.'s Resp. to Def.'s SMF* ¶¶ 20, 70.  From July 1, 2002 to June 30, 2005, Dr. Mary Susan Erich was the Department Chair.  *Def.'s SMF* ¶ 74; *Pl.'s Resp. to Def.'s SMF* ¶ 74.   Between July 2005 and July 2008, including the time of Dr. Osher's tenure review, Dr. Gregory Porter was the Chair of the Department.  *Def.'s SMF* ¶ 99; *Pl.'s Resp. to Def.'s SMF* ¶ 99.

### 1.    Dr. Ivan Fernandez, Department Chair from July 1999 to July 2002

Dr. Osher says that her difficulties with Dr. Fernandez began before she arrived at the University.  During the interview process in February 1999, Dr. Fernandez became aware that Dr. Osher had a female partner.[6]  *Pl.'s SMF* ¶ 176.  Dr. Fernandez initially offered to pay to bring Dr. Osher's partner to Maine for the second interview, but when Dr. Osher disclosed that her partner was female, Dr. Fernandez said he would need to get back to her.  *Id*.  The next day, Dr. Fernandez informed Dr. Osher that the travel costs for her partner would be covered.  *Id.*

At the time of hire, Dr. Fernandez was not aware that Dr. Osher had a long term permanent back disability.  *Pl.'s Resp. to Def.'s SMF* ¶ 30.  When Dr. Osher informed Dr. Fernandez of her disability and her need for accommodation in April 1999, Dr. Fernandez stated that he would not provide the accommodations requested.  *Id.*; *Pl.'s SMF* ¶¶ 177, 178.  Dr.

---

[6] Even though his involvement in hiring Dr. Osher took place before he became Department Chair, the parties agree that Dr. Fernandez participated in Dr. Osher's initial interview and coordinated her hiring package.  *Def.'s SMF* ¶¶ 21, 22, 26; *Pl.'s Resp. to Def.'s SMF* ¶¶ 21, 22, 26.

Fernandez objected because the additional costs exceeded the Department's budget. *Pl.'s SMF* ¶ 180. On May 18, 1999, Dr. Osher reported Dr. Fernandez's refusal to the Human Resources (HR) Office of the University and informed HR that she would need accommodation for her disability, including special office furniture and additional moving costs. *Pl.'s SMF* ¶¶ 178, 179. After much discussion among Dr. Osher, Dr. Fernandez, and HR, additional funds were secured, and by October 1999, Dr. Osher's lab and workstation were set up to allow her to perform her job without limitation. *Def.'s SMF* ¶¶ 40-43; *Pl.'s Resp. to Def.'s SMF* ¶¶ 40-43.

Dr. Osher did not make any additional requests to accommodate her disability to Dr. Fernandez either directly or indirectly. *Def.'s SMF* ¶ 44; *Pl.'s Resp. to Def.'s SMF* ¶ 44. However, Dr. Osher alleges that her relationship with Dr. Fernandez was severely strained as a result of this request. Dr. Osher found Dr. Fernandez negative and unsupportive. *Pl.'s SMF* ¶ 179. When she asked him about this, Dr. Fernandez responded that he found Dr. Osher "fundamentally dishonest" because she had not told him she was disabled during the interview process. *Id.* Dr. Osher believes that because of her accommodation request, Dr. Fernandez and Dr. Mary Susan Erich, another professor within the Department, considered her a "complainer." *Pl.'s SMF* ¶ 182.

In June 2000 at the end of her first academic year, Dr. Fernandez wrote a letter to Dr. Osher regarding her job performance. *Pl.'s SMF* ¶ 186. Dr. Osher objected to the letter and wanted it removed from her personnel file because some of the information was not substantiated by signed letters from students, which Dr. Osher alleged was a violation of the union contract. *Def.'s SMF* ¶ 46; *Pl.'s Resp. to Def.'s SMF* ¶ 46; *Pl.'s SMF* ¶ 186. In response to Dr. Osher's request, Dr. Fernandez removed the June 2000 letter and replaced it with one dated August 8, 2000 and attached the student's statements. *Con. SMF* ¶ 186. The statements included that Dr.

Osher brought up gay rights issues during class and discussed her personal life during lab and an office meeting.  *Pl.'s SMF ¶ 268.*  Dr. Fernandez suggested that Dr. Osher not discuss her "personal life" in class.  *Def.'s SMF ¶¶ 167; Pl.'s Resp. to Def.'s SMF ¶ 167; Pl.'s SMF ¶ 269.* Dr. Osher used an analogy in class to compare the discrimination of homosexuals to the discrimination of rare isotopes.  *Def.'s SMF ¶¶ 162, 163; Pl.'s Resp. to Def.'s SMF ¶¶ 162, 163; Pl.'s SMF ¶ 266.*  This classroom discussion occurred after Dr. Fernandez had counseled Dr. Osher against spending too much time discussing her "personal life" in class.  *Pl.'s SMF ¶ 267.*

The August 2000 also letter discussed positive aspects of Dr. Osher's performance her first year, and provided some suggestions going forward.  *Def.'s SMF ¶ 58; Pl.'s Resp. to Def.'s SMF ¶ 58.*  Dr. Fernandez suggested that Dr. Osher be timelier with meeting deadlines and he made suggestions for improving her teaching performance.  *Def.'s SMF ¶ 59; Pl.'s Resp. to Def.'s SMF ¶ 59.*

In response to the June 2000 letter, Dr. Osher made an informal complaint to her Union Representative, Carol Gilmore, claiming that Dr. Fernandez was discriminating against her because of her sexual orientation in violation of the Collective Bargaining Agreement.  *Pl.'s SMF ¶ 188.*  Ms. Gilmore notified Dr. Osher that her complaints would be relayed to G. Bruce Wiersma, Dean of the College of Natural Sciences, Forestry and Agriculture.  *Id.*  Dr. Osher never made a formal or informal complaint to the University Equal Opportunity Office (EOO) about Dr. Fernandez.  *Def.'s SMF ¶ 55; Pl.'s Resp. to Def.'s SMF ¶ 55.*

Shortly thereafter, Dr. Osher made an appointment with Dean Wiersma.  *Pl.'s SMF ¶ 187; Def.'s SMF ¶ 47; Pl.'s Resp. to Def.'s SMF ¶ 47.*  When Dr. Fernandez asked Dr. Osher why she was meeting with Dean Wiersma, Dr. Osher replied that she wanted to meet with the dean because he had told her to come by and tell him how she was doing.  *Def.'s SMF ¶ 48; Pl.'s*

*Resp. to Def.'s SMF* ¶ 48.  Dr. Osher got the impression that Dr. Fernandez was unhappy that she was talking to someone outside of the Department.  *Def.'s SMF* ¶ 52, *Pl.'s Resp. to Def.'s SMF* ¶ 52.  During her meeting with the Dean, Dr. Osher did not bring up the June 2000 letter, and instead explained that she was having difficulty communicating with Dr. Fernandez and requested mentors to help with the commutation problem.  *Def.'s SMF* ¶¶ 53, 54; *Pl.'s Resp. to Def.'s SMF* ¶ 53, 54.  The issues discussed at this meeting were never conveyed to Dr. Fernandez.  *Def.'s SMF* ¶¶ 49, 50; *Pl.'s Resp. to Def.'s SMF* ¶¶ 49, 50.

In February 2001, Dr. Fernandez told Dr. Osher that there was no lab space available and he was not going to make an effort to find another lab for her.  *Pl.'s SMF* ¶ 189.  Dr. Osher complained to the EOO when Dr. Fernandez did not assign her a lab, explaining that a lab was necessary due to her 60% research appointment.  *Pl.'s SMF* ¶ 190.  After this complaint, Dr. Osher secured space for a temporary lab.  *Pl.'s SMF* ¶ 191.[7]

As Department Chair, Dr. Fernandez received the 2000, 2001 and 2002 PRC letters recommending Dr. Osher's reappointment.  *Def.'s SMF* ¶ 70; *Pl.'s Resp. to Def.'s SMF* ¶ 70.  Each year, Dr. Fernandez recommended Dr. Osher for reappointment.  *Def.'s SMF* ¶ 72; *Pl.'s Resp. to Def.'s SMF*.  In October 2006, Dr. Fernandez was a member of the Peer Review Committee that reviewed Dr. Osher's application for tenure.  *Pl.'s SMF* ¶ 221; *Def.'s SMF* ¶ 118; *Pl.'s Resp. to Def.'s SMF* ¶ 118.  He voted against granting tenure to Dr. Osher.  *Def.'s SMF* ¶ 119; *Pl.'s Resp. to Def.'s SMF* ¶ 119.

---

[7] The Court is not clear whether, in view of her recently-filed Stipulation, Dr. Osher is still claiming this episode as part of her case, but the Court has mentioned it in excess of caution.  In accordance with its earlier Order on Objections and Motions to Strike, the Court allowed the System's qualified objection to stand, namely that Dr. Osher received new lab space after the entity from which the Department was renting lab space moved someone else into that space, causing the need to move Dr. Osher to new lab space.  *Order on Objections and Motions to Strike* at 33 (Docket # 58) (*Order on Ob. and Mot. to Strike*).  For purposes of the motion for summary judgment, however, the Court has taken Dr. Osher's statement of material facts as true.

### 2. Dr. Mary Susan Erich, Department Chair from July 2002 to July 2005

The relationship between Dr. Erich and Dr. Osher was also problematic. Dr. Erich would often drop in on Dr. Osher to discuss concerns with her teaching. *Pl.'s SMF* ¶ 193. One such meeting occurred in October 2002, during which Dr. Erich conveyed a student concern that she was treating male students less favorably than female students. *Pl.'s SMF* ¶ 200. Dr. Osher responded to this meeting, by letter dated November 6, 2002, in which she stated that Dr. Erich made an unwarranted allegation of discrimination, and that by conveying a baseless accusation, Dr. Erich was discriminating against Dr. Osher on the basis of sexual preference and creating a hostile work environment. *Pl.'s SMF* ¶ 201. In the letter, Dr. Osher requested the presence of Dr. Evelyn Silver, the Director of the EOO, at future discussions involving sexual orientation. *Pl.'s SMF* ¶ 202. Dr. Silver received copies of these correspondences and was aware of the disagreement between Dr. Osher and Dr. Erich. *Pl.'s SMF* ¶ 202; *Con. SMF* ¶ 82. This is the only action or statement by Dr. Erich which Dr. Osher found homophobic. *Def.'s SMF* ¶ 80; *Pl.'s Resp. to Def.'s SMF* ¶ 80.

To improve their working relationship, Dr. Osher and Dr. Erich began attending Employee Assistant Program sessions. *Pl.'s SMF* ¶¶ 204, 205. These sessions proved unsuccessful and in February 2003, Dr. Osher left a telephone message with Dr. Silver stating that she was seeking legal advice for employment discrimination based on sexual orientation. *Pl.'s SMF* ¶ 84; *Pl.'s Resp. to Def.'s SMF* ¶ 84. Dr. Silver responded by letter and described the process for filing a complaint. *Pl.'s SMF* ¶ 207. Based on this letter, Dr. Osher believed that other EOO staff would handle her complaint for discrimination, and so she contacted the University's EOO office in Bangor, rather than Dr. Silver to follow up on her complaint. *Pl.'s SMF* ¶ 208. Although Dr. Osher made multiple informal requests with the EOO, she never filed

a formal written complaint for fear that it would create animosity and result in her losing her job. *Pl.'s SMF* ¶ 210. In 2003, Dr. Osher also complained to the EOO because she was required to have a third party administer her teaching evaluations, a requirement that was not imposed on other faculty. *Pl.'s SMF* ¶ 211.

As Department Chair, Dr. Erich reviewed the PRC reappointment recommendations for Dr. Osher in 2003, 2004 and 2005. *Def.'s SMF* ¶¶ 90, 93, 95; *Pl.'s Resp. to Def.'s SMF* ¶¶ 90, 93, 95. Each year Dr. Erich recommended Dr. Osher for reappointment. *Def.'s SMF* ¶ 97; *Pl.'s Resp. to Def.'s SMF* ¶ 97. In October 2006, Dr. Erich was a member of the Peer Review Committee that reviewed Dr. Osher's tenure application. *Pl.'s SMF* ¶ 221, *Def.'s SMF* ¶ 116; *Pl.'s Resp. to Def.'s SMF* ¶ 116. She voted against granting tenure to Dr. Osher. *Def.'s SMF* ¶ 117; *Pl.'s Resp. to Def.'s SMF* ¶ 117.

### 3. Dr. Gregory Porter, Department Chair from July 2005 to July 2008

Dr. Porter became Chair of the Department in July 2005 and remained Chair throughout Dr. Osher's tenure process. *DSMF* ¶ 99; *PRSMF* ¶ 00. Dr. Osher informed Dr. Porter in September 2005, that she felt mistreated by Dr. Erich and Dr. Fernandez, and on March 21, 2006, she told Dr. Porter that Dr. Erich had "harassed" her when Dr. Erich was the Department Chair. *Pl.'s SMF* ¶ 257.

### C. Dr. Osher's Performance

During her probationary period, Dr. Osher developed a research focus on estuary soils, a relatively new field and secured funding to complete that research. *Pl.'s SMF* ¶¶ 234, 235. Dr. Osher collaborated with other scientists including Dr. Hilary Neckles, Research Ecologist with the U.S. Geological Service in Augusta, Maine; Mark Stolt, Associate Professor of Environmental Soil Science at the University of Rhode Island; and, Martin Rabenhorst,

Professor of Pedology at the University of Maryland.  *Pl.'s SMF* ¶ 235.   Dr. Osher received

several invitations to make presentations on estuary soils at conferences and symposia.  *Pl.'s*

*SMF* ¶ 237.  She was the recipient of numerous grants, including a grant from the United States

Department of Agriculture, and secured funding for her research in 23 out of 37 proposals.  *Pl.'s*

*SMF* ¶¶ 238, 252.  In terms of her teaching, Dr. Osher initially had the greatest difficulty with

her primary course, PSE 344, but student evaluations from this course showed improvement over

her probationary period.  *Pl.'s SMF* ¶ 243.  Student evaluations from Dr. Osher's other courses

were "acceptable to good."  *Pl.'s SMF* ¶ 244.  In the spring of 2006, Dr. Osher received the

Sustainable Agriculture Award, a college wide award.  *Pl.'s SMF* ¶ 251.  In November 2006, in

recognition for her excellence in teaching Dr. Osher was appointed a Peer Consultant by the

University's Center for Teaching Excellence.  *Pl.'s SMF* ¶ 245.

### D.  The Annual Review and Reappointments of Dr. Osher

Between 2000 and 2006, Dr. Osher's performance as an Associate Professor was

reviewed by the PRC and each year the PRC wrote a letter to the Chair of the Department

recommending Dr. Osher for reappointment.  *Pl.'s SMF* ¶ 215.  Each year the Chair of the

Department recommended Dr. Osher's appointment to the Dean of the College of Natural

Sciences, Forestry and Agriculture.  *Id.*  Each year, the Dean made similar a recommendation to

the Provost, and the Provost made a similar recommendation to the President.  *Def.'s SMF* ¶¶

105, 106; *Pl.'s SMF* ¶¶ 105, 106.  Between 2000 and 2006, the President reappointed Dr. Osher

to a one-year term.  *Def.'s SMF* ¶ 107; *Pl.'s SMF* ¶¶ 107.

### 1.  The 2000, 2001 and 2002 PRC Letters

The PRC letters during the time when Dr. Fernandez was Department Chair discussed

positive aspects of Dr. Osher's performance, but also discussed problems in Dr. Osher's

teaching.  *Def.'s SMF* ¶ 71; *Pl.'s Resp. to Def.'s SMF* ¶ 71.  The letters stressed the need for Dr. Osher to find focus on and complete research at the University, and to develop funding for such research and to have the research published in peer reviewed letters.   *Id.*

### 2.        The 2003, 2004 and 2005 PRC Letters

The 2003 letter from the PRC "commend[ed] Dr. Osher on the detailed presentation of teaching materials and also applaud her efforts to improve teaching performance."  *Pl.'s SMF* ¶ 216.  As to Dr. Osher's research, the PRC noted that Dr. Osher "has been primary author on one accepted, peer-reviewed paper and co-author on another. . . . Over the next few years, it will be important for her to continue building a track record of primary author, peer reviewed journal publications from her current research program.  The activity report lists an additional six papers in preparation which is a positive indication of her potential for success in this endeavor.  Publishing the results of her University of Maine research in peer-reviewed journals needs to be a major focus of Dr. Osher's work effort leading to her tenure application."  *Pl.'s SMF* ¶ 216.[8]

The 2004 PRC letter discussed both positive and negative aspects of Dr. Osher's performance.  *Def.'s SMF* ¶ 93; *Pl.'s Resp. to Def.'s SMF* ¶ 93.  The PRC noted continued problems with Dr. Osher's teaching, but applauded her efforts to improve her teaching, and suggested that she focus on improving existing courses.  *Id.*  The PRC urged Dr. Osher to complete writing projects during the coming year to build as strong a publication record as possible for her tenure review.  *Id.*  The PRC also suggested that Dr. Osher limit her grant writing efforts and other research efforts to the minimum necessary to sustain her program while she focuses on seeing these writing projects to completion.  *Id.*

The 2005 PRC letter noted Dr. Osher's continued improvement in teaching.  "Student course evaluations for PSE442/444 continue to be positive.  For the first three semesters, PSE334

---

[8] Plaintiff's statement of material fact 216 states "another" instead of "additional" and omits the word "effort."

evaluations were poor; however, we note a dramatic improvement in student responses during 2004." *Pl.'s Resp. to Def.'s SMF* ¶ 95. The PRC recommended that Dr. Osher use the next few months prior to promotion and tenure consideration to make a concentrated effort toward building her publication record from research conducted since arriving at the University. *Def.'s SMF* ¶ 95; *Pl.'s Resp. to Def.'s SMF* ¶ 95. The PRC specifically suggested that Dr. Osher limit her service, grant writing, and other research efforts to a minimum necessary to sustain her program while she focuses on seeing the writing projects to their completion. *Id*. The PRC was concerned with Dr. Osher's slow progress in publishing results from University research and urged her to give this issue the highest priority. *Id.*

### 3. The 2006 PRC Letter

With regard Dr. Osher's research, the PRC in 2006 noted that Dr. Osher was the primary investigator or co-primary investigator on four grant proposals and that "Dr. Osher has moved several manuscripts forward to acceptance in the peer reviewed literature" and encouraged Dr. Osher to focus on "publications in the peer-reviewed literature, which will produce as strong a tenure document as possible." *Pl.'s SMF* ¶ 219. As for her teaching, the PRC noted "[w]e are again very pleased to see positive student evaluations in all of Dr. Osher's courses." *Pl.'s SMF* ¶ 219. In closing, the PRC expressed "we continue to be supportive of the research focus that Dr. Osher has developed on submerged soils and estuarine processes." *Pl.'s SMF* ¶ 219.

In May 2006, Dr. Porter recommended to the Dean of the College that Dr. Osher be reappointed. *Def.'s SMF* ¶ 102; *Pl.'s SMF* ¶ 102. Dr. Porter noted Dr. Osher's improvement in teaching stating that the evaluations of her teaching "h[ad] improved markedly in recent years" and "[h]er teaching program has improved in recent years, based on student evaluations obtained through Spring 2005." *Pl.'s Resp. to Def.'s SMF* ¶ 103. He also emphasized the need for Dr.

14

Osher to publish the results of her University of Maine research in peer-reviewed journals. *Def.'s SMF* ¶ 103; *Pl.'s Resp. to Def.'s SMF* ¶ 103.

### E.   Dr. Osher's Tenure Review

In October 2006 Dr. Osher submitted her application for tenure to the PRC comprised of Dr. David Lambert, the Peer Chair, Dr. Fernandez, Dr. Erich and her husband Dr. Tsutomu Ohno, Dr. Aram Calhoun and Dr. Marianne Sarrantonio. *Def.'s SMF* ¶ 108; *Pl.'s Resp. to Def.'s SMF* ¶ 108; *Pl.'s SMF* ¶ 221. The Committee voted five to one not to recommend Dr. Osher for promotion to tenure. *Def.'s SMF* ¶ 121; *Pl.'s Resp. to Def.'s SMF* ¶ 121. On November 9, 2006, the PRC wrote to the Department Chair, Dr. Porter, recommending that Dr. Osher not be given tenure because she had not "demonstrated excellence, as judged by the Peer Committee and Department Chairperson, in []her professional activities that address the responsibilities of the position and the mission of the Department." *Pl.'s SMF* ¶ 224.

With regard to Dr. Osher's research, the PRC noted that her eight peer-review scientific publications "satisfied the minimum publication standard as it existed when Dr. Osher was hired," but was "marginal" for a 60% research appointment. *Def.'s SMF* ¶¶ 122, 150; *Pl.'s Resp. to Def.'s SMF* ¶¶ 122; 150. The letter stated that "[i]n no instance did [Dr. Osher] provide the leadership to bring together a team of scientists for a successful proposal and research initiative," *Pl.'s SMF* ¶ 232, and noted that "[r]ecognition of Dr. Osher's research is based more on contacts she has made by attending professional functions rather than through the reputation of her published work." *Pl.'s SMF* ¶ 231. The letter also observed that "there is no record of continuous collaborations within the University or within [Dr. Osher's] profession at large. Normally, evidence of positive collaboration would come from University colleagues' letters of

15

reference, service of graduate committees chaired by other faculty, and co-authorship of publications.  There is little such evidence in Dr. Osher's package."  *Pl.'s SMF* ¶ 239.

As for her teaching, the letter noted that Dr. Osher had "consistently poor teaching evaluations from her yearly course [PSE 344]."  *Pl.'s Resp. to Def.'s SMF* ¶ 152.  "[Dr. Osher's] performance improved to average in PSE 344 but has regressed in recent evaluations.  Her evaluations have been acceptable to good in other courses."  *Pl.'s Resp. to Def.'s SMF* ¶ 122; *Pl.'s SMF* ¶¶ 243,[9] 244.  The PRC also contended that "[s]tudents in several courses complained of issues ranging from lack of organization and accountability to discussions of her personal life which took away from instructional time or were used to include the outcome of student evaluations."  *Pl.'s SMF* ¶ 241.

With regard to service, the letter noted that Dr. Osher had been "very involved with service activities within her professions."  *Pl.'s SMF* ¶ 246.  The PRC noted "a significant concern" with "Dr. Osher's department interactions."  *Pl.'s SMF* ¶ 248.  It also pointed out problems with the quality and accuracy of Dr. Osher's tenure application.  *Def.'s SMF* ¶ 153; *Pl.'s Resp. to Def.'s SMF* ¶ 153.

On November 17, 2006, Dr. Osher wrote Dr. Porter with her disagreements as to the PRC's recommendation.  *Def.'s SMF* ¶ 124; *Pl.'s Resp. to Def.'s SMF* ¶ 124.  Dr. Porter reviewed Dr. Osher's tenure application, the PRC's recommendation and Dr. Osher's response and on November 22, 2006, informed the Dean of the College, Edward Ashworth, that he could not support Dr. Osher's application for tenure.  *Def.'s SMF* ¶¶ 125, 127; *Pl.'s Resp. to Def.'s SMF* ¶¶ 125, 127.  Dean Ashworth reviewed Dr. Osher's application materials and the recommendation from the PRC and the Department Chair and on December 2, 2006, wrote to Dr. Edna Mora Szymanski, the University Senior Vice President for Academic Affairs and

---

[9]  In her response, Dr. Osher omitted the words "to average" after "improved."  *Pl.'s Resp. to Def.'s SMF* ¶ 122.

Provost, stating that he "[did] not see significant evidence that would cause [him] to overrule the Peer Committee's recommendation or that of the department chair" and that he did not support Dr. Osher's application for tenure.  *Def.'s SMF ¶ 133; Pl.'s Resp. to SMF ¶ 133; Pl.'s SMF ¶ 259.*[10]  Provost Szymanski reviewed Dr. Osher's application materials, and the recommendations from the PRC, Dr. Porter, and Dean Ashworth.  *Def.'s SMF ¶ 134; Pl.'s Resp. to SMF ¶ 134; Pl.'s SMF ¶ 260.*  As part of the review process, Provost Szymanski met with the Promotion and Tenure Advisory Committee to discuss Dr. Osher's application.  *Def.'s SMF ¶ 136; Pl.'s Res. to Def.'s SMF ¶ 136.*  With the "full concurrence" of this committee, Provost Szymanski in a letter dated January 29, 2007, recommended to the University President, Robert Kennedy, that Dr. Osher's application for tenure be denied.  *Pl.'s SMF ¶ 262.*[11]  After considering the recommendations of the PRC, the Department Chair, the Dean and the Provost, President Kennedy by letter dated February 2, 2007, informed Dr. Osher that he concurred with the recommendation of Provost Szymanski that she not be promoted to Assistant Professor with tenure.  *Def.'s SMF ¶¶ 141, 142, 143; Pl.'s Resp. to Def.'s SMF ¶¶ 141, 142, 143.*

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect

---

[10]   Dr. Osher misquoted Dean Ashworth's letter as stating that he was unable to "find sufficient evidence in her record to cause me to differ with the recommendation from the Peer Review Committee and Department Chair." *Pl.'s SMF ¶ 259.*

[11]   Provost Szymanski submitted two letters to President Kennedy, one on January 16, 2007 and the second on January 29, 2007.  The contents of the letters are exactly the same, except that the January 29 letter indicates that Susan Hunter, the wife of Dr. Lambert, recused herself from the conversation due to a conflict of interest. *Pl.'s SMF ¶ 262; Con. SMF ¶ 262.*

the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st

Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield,* 370 F.3d 215, 218-19 (1st Cir.

2004)) (internal quotation marks omitted).   "Neither conclusory allegations [nor] improbable

inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231,

236-37 (1st Cir. 2009) (citation and internal quotation marks omitted).   For a retaliation claim "to

survive a motion for summary judgment, the plaintiff must point to evidence in the record that

would permit a rational factfinder to conclude that the employment action was retaliatory." *King*

*v. Town of Hanover*, 116 F.3d 965, 968 (1st Cir. 1997).

## III.   LEGAL ANALYSIS

### A.   The Shifting Burden Analysis Under the Maine Whistleblowers' Protection Act (Count I), Maine Human Rights Act (Count II), and Title VII (Count III)[12]

In Counts I, II and III of her complaint, Dr. Osher contends that the System unlawfully

retaliated against her in violation of the Maine Whistleblowers' Protection Act (MWPA),[13] the

Maine Humans Right Act (MHRA), and Title VII of the Civil Rights Act of 1964.   More

specifically she alleges that the System denied her tenure in retaliation for her complaints about

the failure to accommodate her disability and about discrimination on the basis of her sexual

orientation.

---

[12] The same analytical framework applies to retaliation claims under Title VII and to claims brought under the
Maine Human Rights Act (MHRA).  *Roussel v. St. Joseph Hosp.*, 257 F. Supp. 280, 285 (D. Me. 2003); *Green v.
Maine Sch. Admin. Dist.*, 77, 52 F. Supp. 98, 109 (D. Me. 1999); *Higgins v. New Balance Athletic  Shoe*, Inc., 21 F.
Supp. 2d 66, 72 (D. Me. 1998). The parties do not suggest that a different analysis should be applied to Counts I, II
and III.  Therefore, the Court discusses these counts together.

[13] Although the MWPA provides no private right of action, plaintiffs may file a civil action under the MHRA.  *Tripp
v. Cole*, 425 F.3d 5, 9 n.4 (1st Cir. 2005); *see also Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954
A.2d 1051, 1053 (stating "[t]he MHPA provides a right of action to persons who have been subject to unlawful
discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment
actions") (citations and footnote omitted)).

Unlawful retaliation claims are evaluated with the "shifting burdens" analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Fennell v. First Step Designs, Inc.* 83 F.3d 526, 535 (1st Cir. 1996). Under that formula, Dr. Osher has the undemanding task of demonstrating a prima facie case of unlawful retaliation. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991) (stating that "[t]he burden of making out a prima facie case is 'not onerous'") (citation omitted)). To establish a prima facie case of unlawful retaliation under state and federal law, Dr. Osher must show that (1) she engaged in an activity protected by the applicable statute; (2) she suffered an adverse employment action; and, (3) the adverse employment action was causally connected to the protected activity. *Fantini v. Salem State College*, 557 F.3d 22, 32 (1st Cir. 2009) (Title VII); *Bishop v. Bell Atlantic Corp.*, 299 F.3d 53, 58 (1st Cir. 2002) (MHRA).

If Dr. Osher can demonstrate the elements of her prima facie case of unlawful retaliation, the evidentiary burden shifts to the System to articulate a legitimate, non-retaliatory reason for taking the adverse action against the plaintiff. *See Fennell,* 83 F.3d at 535. If it does so, the burden shifts back to Dr. Osher to demonstrate that the System's non-retaliatory reasons were pretext and that the true reason it took the adverse action was retaliatory. *Id.*; *Smith v. Heritage Salmon*, 180 F. Supp. 2d 208, 216 (D. Me. 2002).

**B.    Dr. Osher's Prima Facie Case**

The System contends that Dr. Osher failed to demonstrate the first and third elements of her prima facie case.

**1.    Protected Activity**

**a.    The System's Position:  No Protected Activity**

The System says that Dr. Osher's claim "is premised on two alleged 'reports' of unlawful conduct:  1) in 1999, she 'went outside of her department' (to the [HR] Office) to seek redress after the Department Chair, Ivan Fernandez, told her there was no money to accommodate her disability; and 2) in June 2000, she went to the Dean after Dr. Fernandez wrote a letter to her file regarding her job performance that she objected to on the basis that it included information he received from students that was not substantiated by signed letters from those students."  *Def.'s Mot. for Summ. J.* at 10.  The System contends that "[n]either of these incidents constitutes a report as required by the [M]WPA."  *Id.*  It claims that the report "has to be sufficient for an employer to be aware that the employee is alleging a violation of some kind" and that the report here failed to meet that standard.  *Id.* at 10-11.

### b.        Dr. Osher's Position:  On Several Occasions

Dr. Osher disagrees.  She says that, contrary to the System's position, she complained "on several occasions" to the System.  *Pl.'s Resp.* at 8.  She sets forth the various complaints she made from 1999 to 2003.  *Id.*  In addition to the 1999 request, Dr. Osher considers the undated complaint of homophobia made to Dr. Silver, the February 2003 phone message to Dr. Silver requesting advice on sexual orientation discrimination, and the subsequent attempts to pursue an informal complaint of sexual orientation discrimination with the EOO as engaging in protected activity.  *Id.*  She counts the complaints made to the EOO in 2001 and 2003 concerning the lack of lab space and the third-party administration of student evaluations, and the complaint made to her union representative after the June 2000 letter from Dr. Fernandez, as activity protected under the MWPA and Title VII.  *Pl.'s SMF* ¶¶ 188, 211, 212.[14]

---

[14] In her supplementary memorandum, Dr. Osher mentions complaints she made in 2005 and 2006 to Dr. Porter that she felt mistreated by Drs. Erich and Fernandez, that the lack of assignments of graduate assistants to her might be due to discrimination against her and other female faculty, that Dr. Erich had harassed her under the guise of mentoring, that the PRC's characterization of events were part of a history of the hostile work environment she had

### c.   The Legal Standard for Protected Activity

Under the MWPA, an employee has engaged in a protected activity if she has "reported orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States[.]"  26 M.R.S. A. § 833(1)(A).[15]  Similarly, Title VII protects an employee who "has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a).  Although the MWPA does not define "report," the MWPA has been interpreted so that "[a] protected activity is broadly defined as conduct by [the plaintiff] that is in opposition to an unlawful employment practice of the defendant."  *Curtis v. Sullivan Tire, Inc.*, 584 F. Supp. 2d 206, 212 (D. Me. 2008) (citing *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1054 (Me. 1992)).  The term protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination."  *Fantini*, 557 F.3d at 32 (citation omitted).  It includes not only the filing of administrative complaints, but also complaining to one's supervisors.  *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006).  "[T]he complained-of conduct need not actually be illegal, but the employee must prove that a reasonable person might have believed that it was."  *Tripp v. Cole*, 425 F.3d 5, 9 (1st Cir. 2005) (citation and internal quotation marks omitted); *see also Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999) (explaining that "an employee's reasonable belief that [the conduct] crosses the line suffices").

---

experienced, that there were issues of sexual orientation, disability, and religion, and that the peer review process itself had created a harassing environment.  *Pl.'s Supplemental Summary J. Mem. of Law* at 1-2 (Docket #53); *Pl.'s SMF* ¶ 257.  Again, the Court is not clear to what extent these complaints survive Dr. Osher's recently-filed Stipulation, but for purposes of the motion for summary judgment, the Court has viewed her statements of material fact in the light most favorable to her.

[15] To come under the MWPA's protection the employee must first bring "the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer" and "allow[] the employer a reasonable opportunity to correct that violation, condition or practice unless the employee has specific reason to believe that the reports to the employer will not result in correction of the violation."  26 M.R.S.A. § 833(2).  The System has not alleged that Dr. Osher has not satisfied this requirement.

d.       Discussion

It is true that before her denial of tenure Dr. Osher never filed a formal grievance with the System, the Maine Human Rights Commission, or with the Equal Employment Opportunity Commission. It is also evident that some of Dr. Osher's complaints do not include allegations of discrimination, and therefore arguably do not qualify as protected activity under state and federal law.[16] *See* 26 M.R.S.A. § 833(1)(A) (stating that employee must report "a violation of law"); 42 U.S.C. § 2000e-3(a) (stating that employee must oppose "an unlawful employment practice"). There are however, at least three instances where Dr. Osher clearly engaged in protected activity. These protected activities include her 1999 complaint to the HR Office to "report the failure to accommodate" her disability, *Pl.'s SMF* ¶ 178; her undated complaint to Dr. Silver of the EOO "that she was being harassed by Dr. Erich whom she believed was homophobic," *Pl.'s SMF* ¶ 193; and her phone call to Dr. Silver in February 2003, seeking assistance with a discrimination claim.[17] *Pl.'s SMF* ¶ 206.

---

[16] For example, Dr. Osher's statement with regard to lab space merely states that "Dr. Osher reported Dr. Fernandez's refusal to attempt to locate lab space for her to the Equal Opportunity Employment Office to obtain assistance in getting a lab." *Pl.'s SMF* ¶ 190. Similarly, the statement regarding the third-party administration of student evaluations provides that Dr. Osher "complained to the Equal Opportunity Office that Dr. Erich had imposed student teaching evaluation procedures on Dr. Osher that she had not imposed on other professors, of requiring a third party to administer Dr. Osher's teaching evaluations, while this requirement was not initially imposed on other teachers in the PSE Department." *Pl.'s SMF* ¶ 212. While the different treatment Dr. Osher experienced could be a violation of the law, it is not clear from her statement whether her complaint to the EOO included such an allegation. The same is true for Dr. Osher's informal complaints in 2003 for informal assistance. *Pl.'s SMF* ¶ 209. She has just alleged that she "made multiple requests to the EEO Office to proceed with an information complaint," but she does not state what the complaint was about. *Id.*

[17] Dr. Osher's complaint to Ms. Gilmore, her union representative, about Dr. Fernandez's alleged sexual orientation discrimination is presumably protected activity, but the Court is not clear that it can be held against the System. Dr. Osher's statement of material fact says that Dr. Osher made an informal complaint that Dr. Fernandez was discriminating against her because of sexual orientation and violating the Collective Bargaining Agreement to her Union Representative Carol Gilmore, who notified Dr. Osher that she would relate the complaint regarding Dr. Fernandez's letter to Dean Wiersma. *PRSAMF* ¶ 188. But, there is no evidence that Ms. Gilmore actually told Dean Wiersma or anyone else within the System about this complaint. Dr. Osher presents no authority for the proposition that for retaliation purposes, a statement to a union representative is equivalent to a statement to the employer, and it seems apparent that an employer cannot be held to have retaliated against an employee for making a complaint it never received.

Similarly, there is no evidence that Dr. Porter passed along Dr. Osher's complaints about feeling mistreated by Drs. Fernandez and Erich or being harassed by Dr. Erich when she was Department Chair.

Because these complaints alleged a violation of law or an unlawful employment practice and were made to individuals who could address the violation, the complaints satisfy the protected activity element of MWPA and Title VII retaliation claims. *Freadman v. Metro. Prop. and Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007) ("Requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision"); *see also Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998) (informal complaint to personnel department constitutes protected conduct); *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 231 (1st Cir. 1976) (employees protected "for registering grievances through channels appropriate in the particular employment setting").

### 2.      Adverse Action

The System does not dispute that Ms. Osher was the subject of "an adverse employment action" satisfying the second element of her prima facie case; the Court turns to the final element, whether this adverse employment action is causally connected to the protected activity.

### 3.      Causal Link

"Courts have consistently held the failure to make a showing of causation to be a fatal defect in a retaliation claim." *Stinson v. SimplexGrinnell LP*, 152 Fed. Appx. 8, 11 (1st Cir. 2005). The System argues that there is no causal connection between Dr. Osher's complaint and her tenure denial because of an absence of a "temporal connection between the claimed events . . . and the denial of her tenure application in February 2007, nearly five years later" and the fact that "the decision to award tenure was evaluated on a *de novo* basis by several other layers of review by the Department Chair, the Dean, the Provost and the President." *Def.'s Mot.* at 11.

### a.    Temporal Proximity

The First Circuit has held that an adverse employment action soon after the employee engages in protected activity "is indirect proof of a causal connection between the [adverse action] and the activity because it is strongly suggestive of retaliation." *Calero-Cerezo v. U. S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004) (quoting *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988)).  At oral argument, Dr. Osher conceded that the period between her last complaint and the tenure decision was too long to allow an inference of retaliation, but retracted her concession in a supplementary memorandum.  *Pl.'s Supplementary Summ. J. Mem. of Law* at 1-2 (Docket # 53).  To further complicate the issue, however, the Plaintiff still later stipulated that she was abandoning any claim of religious or gender discrimination, *Stip.*, and some of her later complaints relate solely to those areas.  In the end, the Court concludes that she survives the System's dispositive motion without applying the temporal inference and will leave for another day whether the temporal inference applies to this case.

### b.    Additional Evidence

An absence of a close temporal relationship does not preclude a finding of retaliation. *Lockridge v. Univ. of Me. Sys.*, Civil No. 08-136-P-S, 2009 U.S. Dist. LEXIS 38544, at *63 (D. Me. Apr. 23, 2009), *aff'd* No. 09-1895, 2010 U.S. App. LEXIS 5018 (1st Cir. Mar. 10, 2010). However, absent an inference of retaliation, Dr. Osher must present additional evidence to demonstrate a causal connection.  *Id.*  The evidence need not be direct; it can be circumstantial, and may include, among other things: "evidence of differential treatment in the workplace, statistical evidence showing disparate treatment, and comments by the employer which intimate a retaliatory mindset."  *See Mesnick*, 950 F.2d at 828 (citations omitted).  Changes in an

employer's treatment of its employee after the protected conduct can reveal a causal connection. *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 51 (1st Cir. 1999).

### i.      Hostile and Unpleasant Work Environment

Dr. Osher attempts to strengthen the third element of her prima facie case by claiming that she was subjected to a hostile and unpleasant work environment for which there was no explanation other than disability and/or sexual orientation discrimination.  *Pl.'s Resp.* at 10-11; *Pl.'s SMF* ¶¶ 183, 213.  In her memorandum, she pointed to Dr. Fernandez's statement in 1999 that he viewed her as "fundamentally dishonest," and to her complaints from 2000 to 2003 about sexual orientation discrimination.[18]  *Pl.'s Resp.* at 10.

But, there are several facts undercutting the causal connection claim.  First, there is the passage of time.  As pointed out earlier, Dr. Osher's evidence of Dr. Fernandez's and Dr. Erich's alleged retaliation against her can be traced back to 2003 at the latest.  Second, Dr. Osher never directly accused Dr. Porter of retaliating against her and he was Chair of the Department during the critical period from July 2005 throughout her tenure application process.  Third, as Dr. Osher herself acknowledged:

> Despite her conflicts with Dr. Fernandez and Dr. Erich, Dr. Osher was reappointed each year from 1999 to 2006.  In its reappointment recommendation letter of April 2003, the [PRC] described positive aspects of Dr. Osher's work and commended Dr. Osher on the improvement in her teaching.  That letter also recommended that Dr. Osher focus on publishing the results of her research in peer-reviewed journals.  Dr. Erich, as then-Chair of the [PRC], concurred with the recommendation of reappointment and commended Dr. Osher on the improvement in her lecture classes and her excellent mentoring of student workers.
>
> In May 2006, just five months before Dr. Osher submitted her tenure application, the [PRC] again recommended that Dr. Osher be reappointed to her position,

---

[18] Dr. Osher is not making a stand-alone "hostile work environment" claim.  *Cf. Lockridge*, 2010 U.S. App. LEXIS 5018 at *18 (stating that to establish a hostile work environment sexual harassment claim, a plaintiff must demonstrate "that the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create a hostile work environment") (citation omitted).

> noting her success in grant proposals, her movement toward publication of several manuscripts, and her positive student evaluations of her teaching. Dr. Gregory Porter, then Chair of the [PRC], concurred with the recommendation and lauded Dr. Osher for her aggressive seeking of funding for research, increasing her presence at regional and national meetings, and marked improvement in student evaluations of her teaching.

*Pl's Resp.* at 12 (citations omitted).

To bolster her claim that she was denied tenure in retaliation for her complaints of disability and sexual orientation discrimination, Dr. Osher argues that the tenure review process was tainted by Dr. Fernandez and Dr. Erich's retaliatory animus. *Pl.'s SMF* ¶¶ 213, 257, 263. She supports this argument by claiming that during her tenure review Dr. Fernandez and Dr. Erich dominated the discussion and persuaded other members of the PRC to vote against granting tenure. *Pl.'s SMF* ¶ 213. She states that "[i]t is a fair inference that Dr. Ohno's vote may have been influenced by his wife's [Dr. Erich's] opinion, and it is also a fair inference that the overall vote was influenced by the opinions of Dr. Fernandez and Dr. Erich." *Pl.'s Resp.* at 10 n.8. Dr. Osher also includes a 2004 statement from Dr. Marianne Sarrantonio, a tenured associate professor with the Department, that Dr. Fernandez was never going to let her get tenure because she was a lesbian. *Pl.'s SMF* ¶ 214.

### ii.       Error and Misapplication of the Guidelines

Dr. Osher vigorously attacks the PRC's decision as "fraught with error and misapplication of the applicable guidelines." *Pl.'s Resp.* at 11. She contends that the PRC letter "evaluated Dr. Osher under standards which were not included in the Peer Committee Guidelines and which had not been raised in prior recommendations of the [PRC]." *Id.* at 12-13. First, she says that the PRC misapplied the publication requirement. She calculates that under the standards in effect as of 2000, she was required as a 60% research appointment, to publish only a minimum of 0.6 of a publication per year for a total of 3.6 publications over her six year period.

*Id.* at 13.   She actually published eight peer reviewed articles, "double the number of publications specified in the [PRC] Guidelines."   *Id.*   Yet, she observes that the PRC concluded that her publication record was "marginal for a 60% research appointment" and she says her publication record compared favorably with another candidate who received tenure in 2005.   *Id.* She disputes the PRC's conclusion that there were a "relatively low" number of citations to those publications, presenting her own computations about "impact factor" ratings.   *Id.* at 13-14.

Dr. Osher highlights the Guideline criterion for "Initiative", namely, being a self-starter, and presents an argument that her focus on estuary soils, her obtaining funding for research, her work with other scientists, including graduate students, and the national recognition of her work belie the PRC's denial of tenure.   *Id.* at 14-15.

Dr. Osher attacks the PRC's assertion that "there is no record of continuous collaborations within the University or within her profession at large.   Normally, evidence of positive collaboration would come from University colleagues' letters of reference, service on graduate committees chaired by other faculty, and co-authorship of publications; there is little such evidence in Dr. Osher's package."   *Id.* at 15 (quoting *Dr. Erich Aff.* Ex. 1 at 1).   She contends that her application demonstrated collaborations with other scientists and positive references from University of Maine and out-of-state reviewers.   *Id.*

The PRC letter was not complimentary about her teaching, noting that she initially got poor evaluations from her students and although her performance improved to average in one course, she had regressed in that course more recently.   Other evaluations for other courses were acceptable to good.   Dr. Osher emphatically disagrees.   She says that her course evaluations were on a par with other faculty both in the Department and the University, and in November 2006, she had been appointed a Peer Consultant by the University's Center for Teaching Excellence.

*Id.* at 16.  Dr. Osher agrees with the PRC's conclusion that she had fulfilled the "service" requirement, but contends that the PRC failed to consider her work with faculty outside her Department as required by section III C(4) of the Guidelines.  *Id.* at 16-17.

### iii.    The PRC's Discriminatory References

Dr. Osher's most salient piece of evidence, however, is the PRC's November 9, 2006 decision letter.  *Def.'s SMF* ¶ 153, *Dr. Erich Aff.* Ex. A.  Consisting of two single spaced pages, the letter itemizes the Committee's concerns, including her record of scholarly publication, research proposals, teaching strengths and weaknesses, services activities, and interdepartmental interactions.  *Id.*  Dr. Osher approaches the letter in two ways.  First, she points to two statements that she contends demonstrate retaliatory animus:

> Dr. Osher's teaching appointment is 40%; her actual teaching loads have ranged from 22 to 42% based on the college teaching formula.  Performance in her yearly course, Soil and Water Quality (PSE 344), was initially our greatest concern, as her evaluations were poor.  Students in several courses complained of issues ranging from lack of organization and accountability to <u>discussions of her personal life which took away from instructional time or were used to influence the outcome of student evaluations</u>.  Our annual Peer Committee evaluations stressed the need for improvement in these areas, and to her credit, she subsequently attended many teaching workshops.  Her performance improved to average in PSE 344 but has regressed in recent evaluations.  Her evaluations have been acceptable to good in other courses.  Dr. Osher's teaching strengths are enthusiasm and engagement rather than organization and focus on clear teaching objectives.  She is a good teacher in field-based courses, but weaker in lecture-based classes.  Dr. Osher has mentored five graduate students at the MS level, four of whom have already graduated.

*Id.* at 1 (emphasis supplied).  And:

> <u>A significant concern for the Peer Committee is Dr. Osher's departmental interactions.</u>  Significant time and effort has been spent on establishing and clarifying rules and procedures in an effort to address these interactions.  For example, we have shifted to a third-party administration of student evaluations in part because of concerns raised regarding Dr. Osher's administration of her teaching evaluations.  There are continuing concerns regarding her unanticipated use of other's laboratory supplies and equipment.  <u>Chairs have spent a</u>

> disproportionate amount of their time dealing with her issues and engaged in damage control.

*Id.* at 2.  Dr. Osher says that "discussions of personal life" is to a reference to the alleged student complaints about her discussing gay rights and homosexuality while teaching and "departmental interactions" is a reference to her multiple complaints about disability and sexual orientation bias.

### 4.    Discussion—Dr. Osher's Prima Facie Case

#### a.    Disability Retaliation

Turning first to the allegation of disability discrimination, the Court readily concludes that taken alone the record here is markedly insufficient to prove any causal relationship between her disability complaints in 1999 and the denial of tenure in 2006-07.  Dr. Osher points to only one comment that Dr. Fernandez made in 1999 about her being "fundamentally dishonest" when he learned after hiring her that she needed accommodation for a physical disability.  Dr. Fernandez's single comment in 1999 is insufficient to carry Dr. Osher's burden.  First, as the chronology reflects, Dr. Fernandez made a job offer to Dr. Osher on February 11, 1999.  *Def.'s SMF* ¶ 23.  Under Dr. Osher's recollection, she did not tell Dr. Fernandez that she needed accommodation for her back until after she had undergone back surgery in April 1999.  *Pl.'s Resp. to Def.'s SMF* ¶ 177.  According to Dr. Fernandez, this late notice required him to seek funding from other sources.[19]  Assuming Dr. Osher's version of the discussion is correct, Dr. Fernandez's comment is inherently ambiguous, and therefore not direct evidence of animus.  *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 65 (1st Cir. 2002).  Under either

---

[19] Dr. Osher and Dr. Fernandez disagree about what exactly he told her.  She says that he told her he considered her to be fundamentally dishonest because she failed to reveal her disability during her interview, which she observes she would not be required to do as a matter of law.  *Def.'s SMF* ¶ 38; *Pl.'s Resp. to Def.'s SMF* ¶ 38.  He says that he told her he considered her to be fundamentally dishonest because she failed to tell him about the need for additional funding due to her disability until June 1999 by which time the Department's funding for such accommodations had been committed.  *Def.'s SMF* ¶ 35; *Pl.'s Resp. to Def.'s SMF* ¶ 35.

version, Dr. Fernandez's comment could be viewed not as a reflection of his concern about her disability, but rather a reflection of his concern about timing and its impact on Departmental funding. Instead of informing him shortly after February 11, 1999, when the job offer was made, Dr. Osher waited until after April 1999 by which time Department funds had been committed. *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 583 (1st Cir. 1999) (stating that a "statement that plausibly can be interpreted two different ways - - one discriminatory and the other benign - - does not directly reflect illegal animus and, thus, does not constitute direct evidence"). Under a plausible view of the chronology, it was the timing, not the disability or the need for accommodation that had raised Dr. Fernandez's ire. Further, Dr. Fernandez's single comment falls within the "stray comment" category, since it was a statement by a decisionmaker "unrelated to the decisional process itself." *Shorette v. Rite Aid of Me., Inc.*, 155 F.3d 8, 13 (1st Cir. 1998) (citation omitted).

Finally, "the larger picture undercuts any claim of causation", since subsequent events contradict Dr. Osher's claim of a continuing animus that poisoned the tenure review process. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003), (quoting *Soileau v. Guilford of Me.*, 105 F.3d 12, 16 (1st Cir. 1997)). The University actually accommodated Dr. Osher following her complaint to HR, and the accommodations were effective. There is simply no evidence that this issue persisted beyond 1999. She made no other complaints about disability discrimination after 1999; she continued to be reappointed annually, even when Dr. Fernandez chaired the Department; and, she continued by her own account to do well at the University up until the denial of her tenure application. To credit Dr. Osher's version, a factfinder would have to conclude that Dr. Fernandez's initial response to Dr. Osher's late revelation of her need for accommodation caused in Dr. Fernandez an implacable hatred of Dr. Osher, which he harbored

secretly for years, allowing her to gain a measure of success within the Department, only to scuttle her application for tenure years later in a mean-spirited act of long suppressed retribution. This scenario is simply too implausible to sustain Dr. Osher's causation burden.

### b.      Sexual Orientation Retaliation

Dr. Osher's allegation of sexual orientation discrimination has more evidentiary support than her allegation of disability discrimination.   Dr. Osher points to:

1)   Dr. Fernandez's initial reluctance to pay for her female partner's moving expenses;

2)   Dr. Fernandez's June 2000 criticism of Dr. Osher for discussing her personal life in class;

3)   Dr. Osher's 2002 complaints about harassment by Dr. Erich; and,

4)   Dr. Osher's 2003 informal complaints to Dr. Silver and others at the EOO office about sexual orientation discrimination.

*Pl.'s Mem.* at 8-9.  Dr. Osher highlights the statement in the PRC November 9, 2006 letter in which the Committee expressly referenced her classroom discussion of her personal life and her departmental interactions.

Turning to the first incident, during the first interview, Dr. Fernandez offered to bring Dr. Osher's partner to a second interview, but when she informed him her partner was female, he balked and said he would have to call her back.  *Def.'s SMF* ¶ 22; *Pl.'s Resp. to Def.'s SMF* ¶ 22; *Pl.'s SMF* ¶ 176.  But, after checking, Dr. Fernandez agreed to have the University pay for Dr. Osher's partner's visit.  *Pl.'s SMF* ¶ 176.  More to the point, however, by the time Dr. Fernandez offered Dr. Osher a tenure-track position, he was fully aware of her sexual orientation.  *Def.'s SMF* ¶ 22; *Pl.'s Resp. to Def.'s SMF* ¶ 22.  It is difficult to reconcile Dr. Osher's claim that Dr.

Fernandez's one-day delay in approving payment of Dr. Osher's partner's visit is evidence of his anti-lesbian bias since he quickly obtained approval for payment and later was instrumental in offering Dr. Osher a tenure-track faculty position.

Dr. Fernandez's 2000 letters criticizing Dr. Osher for discussing her personal life in class could constitute evidence of animus against her sexual orientation, but they could as easily reflect his concern that as a science teacher, she was bringing extraneous matters into the classroom and was diverting the students' attention from what she had been hired to teach. Viewing the letters in the light most favorable to Dr. Osher, however, the conclusion must be that the letters objected to her sexual orientation discussions, not simply her raising matters outside the scope of her teaching duties.

Dr. Osher also accuses Dr. Erich of sexual orientation retaliation.[20]   Dr. Osher complained to Dr. Evelyn Silver of the EOO that Dr. Erich was harassing her and that Dr. Osher believed Dr. Erich to be homophobic.  *Id.* ¶ 194.   She contended that Dr. Erich solicited criticisms of Dr. Osher from students and told her she had to be "more quiet" and would have difficulty making tenure if she "made waves."  *Id.* ¶¶ 196, 197.  Then, in October 2002, Dr. Erich accused Dr. Osher of discriminating against male students, and the gist of her accusation was that because she was a lesbian, she was not treating male students appropriately.  *Id.* ¶ 200.  Dr. Osher responded by letter dated November 6, 2002, informing Dr. Erich that her accusation was baseless and itself represented discrimination against her on the basis of her sexual orientation. *Id.* ¶ 201.  Dr. Osher then asked Dr. Silver to be present any time Dr. Erich raised issues relating to sexual orientation.  *Id.* ¶ 202.  Dr. Erich suggested to Dr. Osher that she needed therapy and when Dr. Osher suggested that they go to the Employee Assistance Program (EAP) together, Dr.

---

[20] In its Order on Objections and Motions to Strike, the Court struck for purposes of the motion for summary judgment Dr. Osher's assertion as a fact, not as her belief, that Dr. Erich dropped by her office and related criticisms of her "under the guise of mentoring."  *Order on Ob. and Mot. to Strike* at 33-34.

Erich attended some unsuccessful sessions, but they ended, when Dr. Erich refused to follow the EAP counselor's guidelines for behavior during those sessions.  *Id.* ¶¶ 203-05.  This led Dr. Osher to ask for Dr. Silver's assistance to remedy discrimination based on sexual orientation.  *Id.* ¶ 206.  Dr. Osher contacted the EOO about filing an informal complaint, but got the impression that there was no informal complaint procedure and she decided not to file a formal complaint, because she thought it would generate too much animosity, and she would lose her job.  *Id.* ¶ 210.

Even under Dr. Osher's rendition of the facts, there was a significant period of quiescence.  Before Dr. Porter became Chair in July 2005, Dr. Osher had made no complaints of sexual orientation discrimination since 2003, and after Dr. Porter became Chair, Dr. Osher did not return to the EOO about fears of sexual orientation discrimination and she continued to receive reasonably positive annual reappointment appraisals.

In this context, the reference in the November 9, 2006 letter to "discussions of her personal life," presumably referring back to Dr. Fernandez's 2000 interchange with Dr. Osher seems odd.  There had apparently been no similar complaints for years and, even though Dr. Osher had rankled about Dr. Fernandez's 2000 criticism, she avoided similar comments during class and her annual evaluations do not mention concerns about inappropriate areas of discussion as a teacher.  The System may well have a perfectly legitimate explanation for why these old concerns were rehashed in the tenure denial letter, but it is difficult to conclude that the reference to "discussions of her personal life" did not refer to discussions of her sexual orientation, and if so, Dr. Osher has raised a genuine issue of material fact as to whether Dr. Fernandez in particular and perhaps Dr. Erich after him, acted against Dr. Osher's tenure application because of their animosity against her sexual orientation.

### c.      Disability and Sexual Orientation Discrimination

Once the Court determines that retaliation on the basis of sexual orientation has been fairly raised, it causes a re-evaluation of the rest of Dr. Osher's complaint.  Beginning with Dr. Fernandez's irritation at her disability, continuing with her difficulty with him in 2000 over personal life comments, with multiple EOO complaints, the active intervention of Dr. Silver, and ending with unsuccessful EAP counseling with Dr. Erich, the causal string linking her complaints to the PRC's denial of tenure becomes more plausible.  When the PRC met, they had to consider whether they wanted a person like Dr. Osher as a lifelong colleague in their small academic department, someone who was hyper-sensitive to criticism, who interpreted each off-hand comment as motivated by discriminatory animus, and who would persistently involve University administration in Departmental and inter-personal matters.  In short, the members of the PRC had to consider whether they wanted a "complainer."  *Pl.'s SMF* ¶ 182.  This view of the PRC's attitude does not require that Dr. Fernandez and Dr. Erich harbor discriminatory thoughts against lesbians or disabled people or be personally vindictive toward Dr. Osher; it only requires that they resented Dr. Osher's prickly personality, her persistent misinterpretation of their words and actions as betraying some form of discriminatory animus, and her continual resort to authority figures within the University to resolve matters that would commonly remain within the department or among its professionals and that they let their resentment substantially affect their judgment on the merits of her tenure application.

It is with this background that the PRC's written explanation becomes potentially retaliatory:  that a "significant concern" is her 'departmental interactions" and that "Chairs have spent a disproportionate amount of their time dealing with her issues and engaged in damage control."  *Def.'s SMF* ¶ 153, Dr. Erich Aff. Ex. A at 2.  It is true, as the System pointed out, that

the rest of the paragraph discusses problems about her need to clarify rules, her handling of student evaluations, her complaints about laboratory supplies and equipment, and the System's interpretation may well convince a fact-finder. However, for purposes of summary judgment, the Court is obligated to view the evidence in the light most favorable to Dr. Osher, and when viewed in that light, the Court concludes that she has raised a genuine issue of material fact as to whether the denial of tenure was substantially motivated in part by her history of regular complaints to the University administration, starting with her resort to the EOO about her disability and continuing with her repeated complaints about sexual orientation discrimination.

### d.      Numerical Sufficiency – PRC

The tenure denial letter is signed by all six tenured members of the Department. *Def.'s SMF* ¶ 153, *Dr. Erich Aff.* Ex. A at 3. The letter states that the vote was five to one against tenure. *Id.* at 1. It does not reveal, however, how individual members voted and who voiced concerns about Dr. Osher's raising personal issues in class and her departmental interactions. *Id.* Dr. Osher suggests that because Dr. Fernandez had raised similar concerns with Dr. Osher and because Dr. Osher had difficulty interacting with Dr. Erich, they likely voted against her and encouraged the consideration of these issues as part of the tenure decision. *Pl.'s Mem.* at 10-11. She even suggests that because Dr. Erich is married to Dr. Ohno, she must have unduly influenced his view of her application for tenure, *id.*, a position that hardly credits Dr. Ohno's independence and professionalism.

Even though Dr. Osher points to only two of the six members of the PRC as harboring discriminatory intent, under First Circuit law, she says she is not required to demonstrate that a statistical majority of the decision-making committee did so. At oral argument, she cited *Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom.*,

*Brogan v. Scott-Harris*, 523 U.S. 44 (1998), for the proposition that a plaintiff in a race or gender discrimination complaint need not demonstrate a statistical majority of improperly motivated voters in order to prevail.

The *Scott-Harris* rule, however, is more nuanced.  Observing that the "precedent in this area is uncertain, and persuasive arguments can be made on both sides," the First Circuit noted that there is "a certain incongruity in allowing fewer than a majority of the council members to subject the city to liability under section 1983," yet "because discriminatory animus is insidious and a clever pretext can be hard to unmask, the law sometimes constructs procedural devices to ease a victim's burden of proof."  *Id.*  The First Circuit therefore "eschew[ed] . . . a bright-line rule" and instead stated that "in a sufficiently compelling case the requirement that the plaintiff prove bad motive on the part of a majority of the members of the legislative body might be relaxed and a proxy accepted instead.  Nevertheless, any such relaxation would be contingent on the plaintiff mustering evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others."  *Scott-Harris*, 134 F.3d at 438; *Collins v. Nuzzo*, 244 F.3d 246, 251 (1st Cir. 2001).  In sum, the First Circuit said that the "key is likelihood:  Has the plaintiff proffered evidence, direct or circumstantial, which, when reasonable inferences are drawn in her favor, makes it appear more probable (i.e., more likely than not) that discrimination was the real reason underlying the enactment of the ordinance or the adoption of the policy?"  *Id.*

Here, viewing the facts in the light most favorable to Dr. Osher, a jury could find based on the contents of the November 9, 2006 tenure denial letter and its express references to "discussions of her personal life" and "departmental interactions," that not only Drs. Fernandez and Erich harbored discriminatory animus against Dr. Osher, but that the other members of the

PRC, each of whom signed the letter, adopted those impermissible views. Applying *Scott-Harris*, Dr. Osher has produced sufficient evidence to create a genuine issue of material fact about whether Drs. Fernandez and Erich harbored a bad motive against her because of her sexual orientation and disability, and whether the other members of the PRC became complicit. *See Parks v. City of Brewer*, 56 F. Supp. 2d 89, 101-02 (D. Me. 1999) (stating that the "existence of this genuine issue of material fact as to whether a majority of the City Council was impermissibly motivated precludes a finding in favor of the City at the summary judgment stage"); *but see Adams v. Washburn Univ. of Topeka*, 66 Fed. Appx. 819, 823 (10th Cir. 2003) (stating that "evidence of an opportunity to influence does not amount to evidence of actual influence").

### e.    Tiers of Review

A final issue is whether the PRC's retaliatory animus tainted the review process and influenced the decisions of the Chair, the Dean, the Provost and the President. The System argues that any animus found in the PRC letter was removed at subsequent levels of review, because of the fact that "the decision to award tenure was evaluated on a *de novo* basis by several other layers of review by the Department Chair, the Dean, the Provost and the President." *Def.'s Mot.* at 10. *De novo* suggests that each reviewer makes his or her own determination without being bound to adopt the findings and conclusions of the earlier reviewer. *United States v. Cadieux*, 295 F. Supp. 2d 133, 134-35 (D. Me. 2004) (describing a district judge's obligation in performing a *de novo* review of a magistrate judge's recommended decision). The Guidelines specify that while not binding, the Chair and perhaps the Dean are required to consider the PRC's recommendation as a major factor in their evaluations.

Under First Circuit law, to make out an employment discrimination case, the employee must demonstrate either that the actual decisionmaker harbored an impermissible bias or that the "neutral decisionmaker [was] induced to act based on inaccurate information provided because of the provider's discriminatory animus." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 248 n.14 (1st Cir. 2006); *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 352-53 (D. Me. 2007) (discussing the three different approaches applied by circuit courts to issues of subordinate bias liability and stating that the First Circuit currently holds to the middle ground requiring the employee to demonstrate either that the actual decision maker harbored an impermissible bias or that the neutral decision maker was induced to act based on inaccurate information provided because of the provider's discriminatory animus).  Because there is no allegation that either of the two higher level reviewers, Provost Szymanski and President Kennedy, were biased against Dr. Osher, she must demonstrate that they were induced to act based on inaccurate information provided because of the provider's discriminatory animus.

Although Provost Szymanski and President Kennedy performed independent reviews of Dr. Osher's tenure application, by the time the PRC recommendation reached them, it had survived multiple administrative reviews and had gained a certain institutional momentum; it is a fair inference that the Provost and the President were influenced by the recommendations of the prior reviewers.  *See Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 79 (1st Cir. 2004) (finding liability when a neutral decision maker, free of any discriminatory animus, relied on information that was manipulated by another employee who harbors discriminatory animus)[21]; *see also Tuli v. Brigham & Women's Hosp., Inc.*, 566 F. Supp. 32, 56 n.45 (D. Mass. 2008)

---

[21] In *Thompson v. Cola-Cola Co.*, 522 F.3d 168, 179 (1st Cir. 2008), the First Circuit noted that its decision in *Cariglia* may have been different if the employee had been able to appear before the decision maker and present his side of the story.  Dr. Osher did write a letter to Dr. Porter objecting to the PRC's recommendation, but she never appeared before the President to present her side of the story.

(stating that the causal connection is not broken when a decisionmaker acts on biased information without conducting his own independent investigation).  It is unrealistic that the opinions of those with the best perspective, Dr. Osher's peers within the Department, would be ignored by the Dean, the Provost, or the President, or that the Dean, the Provost, and the President would not accord some deference to the recommendation of the PRC.  Furthermore, the Department Chair at the time, Dr. Porter, and Provost Szymanski had knowledge of the discrimination and different treatment that Dr. Osher encountered.

### f.        Super-Tenure Committee

Finally, in reviewing tenure decisions, it is "not the function of the courts to sit as 'super-tenure' committees."  *Villanueva v. Wellesley College*, 930 F.2d 124, 129 (1st Cir. 1991). Moreover, "we are a society that cherishes academic freedom and recognizes that universities deserve great leeway in their operations."  *Cohen v. Brown University*, 101 F.3d 155, 186 (1st Cir. 1996) (citation omitted).  At the same time, "[a]cademic freedom does not embrace the freedom to discriminate."  *Villanueva*, 930 F.2d at 129.

### g.        Conclusion

Dr. Osher's evidence, when viewed in the light most favorable to her, would allow a reasonable factfinder to conclude that there was a causal connection between her disability and sexual orientation discrimination complaints and her denial of tenure.  Having satisfied the third element, Dr. Osher has established her prima facie case of retaliation.

### 5.        Discussion—Legitimate Non-Retaliatory Reason for Denying Tenure

The System has amply provided legitimate non-retaliatory reasons for the tenure denial: namely, that Dr. Osher failed to meet the Department's guidelines for tenure.  The PRC November 9, 2006 letter noted that the PRC had evaluated her level of academic publication and

its merit and concluded that, although "the number satisfied the minimum publication standard as it existed when Dr. Osher was hired," her publication record was "marginal for a 60% research appointment." *Pl.'s SMF* ¶ 153, *Dr. Erich Aff.* Ex. A at 1.  The PRC letter characterized the merit of her publications as "mixed." *Id.*  The PRC letter also criticized her lack of leadership within the academic community, both within the University and within her profession at large. *Id.*  It noted that "[n]ormally, evidence of positive collaboration would come from University colleagues' letters of reference, service on graduate committees chaired by other faculty, and co-authorship of publications; there is little such evidence in Dr. Osher's package." *Id.*

The PRC letter discussed her performance as a teacher. *Id.* at 1-2.  It described her initial evaluations for her yearly course, Soil and Water Quality (PSE 344), as "poor." *Id.* at 1.  In addition to criticizing "discussions of her personal life," the PRC letter observed that students complained that her lectures had a "lack of organization and accountability." *Id.*  Although the PRC letter conceded that after these matters were brought to her attention, she attended teaching workshops and her performance improved "to average in PSE 344", it also said that her performance had "regressed in recent evaluations." *Id.*  The PRC letter commented that she "is a good teacher in field-based courses, but weaker in lecture-based classes." *Id.*

The PRC letter gave Dr. Osher high marks for professional and public service. *Id.* However, in itemizing its concern about Dr. Osher's "departmental interactions," the letter discussed the "significant amount of time and effort spent on establishing and clarifying rules and procedures in an effort to address these interactions," including shifting "to a third-party administration . . . student evaluations in part because of concerns raised regarding Dr. Osher's administration of her teaching evaluations." *Id.*  It mentioned her "unanticipated use of other's laboratory supplies and equipment." *Id.*

Finally, the PRC letter observed that Dr. Osher's handling of her tenure application was a "microcosm of these issues and is illustrative of her performance issues." *Id.* The PRC scheduled a meeting with Dr. Osher for 8 a.m. on October 12, 2006, but she failed to attend. *Id.* Instead, she left a voicemail with the PRC Chair the prior evening, saying she did not want to meet until her letters of recommendation had arrived. *Id.* Describing its disappointment with her initial submission, the PRC letter said her initial application contained "numerous errors, inconsistencies and a lack of attention to detail or to previous instructions." *Id.* Further, some of her academic reviewers, presumably based on evidence she gave them, credited her with accomplishments she had not attained. *Id.* Finally, there was a "lack of uniform support" among the reviewers of her research productivity and direction, and the PRC noted that in the experience of its members, the "lack of uniform support in such letters indicates a weak candidacy." *Id.*

The contents of the PRC letter more than meet the System's obligation "to articulate a legitimate, non-retaliatory reason for its employment decision." *Fennell,* 83 F.3d at 535.

### 6.    Discussion—Pretext

To rebut the University's non-retaliatory reason, Dr. Osher argues that "the tenure standards were applied manifestly unequally, as Dr. Osher had more publications (and more publications of University of Maine research) than a similarly-situated applicant who was awarded tenure just one year earlier, Dr. Osher had on average, excellent teaching scores, and Dr. Osher had an outstanding record on service work." *Pl.'s Mem.* at 18.

With regards to her qualifications for tenure, Dr. Osher compares her application to that of a 2005 tenure applicant from the Department. Dr. Osher claims that this person had the same number of publications, and that only two of the successful applicant's publications were based

on University research.  *Pl.'s SMF* ¶ 228.  She also states that the "impact factors" on her publications received substantially higher scores than the individual who was awarded tenure in 2005.  *Pl.'s SMF* ¶ 230.  Although Dr. Osher's teaching was not stellar in all courses, Dr. Osher has put forth evidence that she improved in her weakest course and her higher level courses were well received.  *Pl.'s SMF* ¶¶ 242-244.  Dr. Osher's collaboration with other scientists, her success with receiving grants for her research, and her receipt of a University wide award all contradict the System's position that Dr. Osher was not a qualified candidate for tenure.  *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (providing that one way to show pretext is to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons").  The Court must also consider in the light most favorable to Dr. Osher the statements and actions of Dr. Fernandez and Dr. Erich suggesting discriminatory animus.  *See Santiago-Ramos*, 217 F.3d at 55 (stating that another way to generate a question as to pretext is to show discriminatory comments made by a person in a position to influence the decision maker).

Viewed in the light most favorable to her, Dr. Osher's cumulated evidence rebuts the argument that she did not meet the University's qualifications for tenure.  *See Che v. Mass. Bay Transp. Auth.*, 343 F.3d 31, 38 (1st Cir. 2003) (stating "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection"); *see also Fennell*, 83 F.3d at 535 (stating that "[o]n summary judgment, . . . a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus").

### C.    Dr. Osher's First Amendment Claim (Count IV)

Dr. Osher's final count is brought pursuant to 42 U.S.C. § 1983, and alleges that the University retaliated against her for speaking out on public issues within the classroom and within the University community at large, in violation of her First Amendment rights to free speech.  Although the System moved for summary judgment on this Count, at oral argument, the System's attorney conceded that the motion was not fully developed.  The Court treats this part of the motion as withdrawn.  *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (stating that the "district court is free to disregard arguments that are not adequately developed").

## IV.    CONCLUSION

The Court DENIES the University's Motion for Summary Judgment (Docket # 24).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 7th day of April, 2010